UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYGNETICS, INC.,

       Plaintiff,

vs.

Case No. 12-cv-14328
HON. GERSHWIN A. DRAIN

HOPS INTERNATIONAL, INC.,

       Defendant.
_____/

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [#41] AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT TO DISMISS THE COUNTERCLAIM [#43]**

**I.  INTRODUCTION**

Presently before the Court is Plaintiff's Motion for Summary Judgment [# 41] and Plaintiff's Motion for Summary Judgment to Dismiss Counterclaim [#43], both filed on October 1, 2013. Defendant filed a Response on October 22, 2013, and Plaintiff filed a Reply on October 31, 2013. Oral arguments were made before the Court on November 6, 2013, at which time, and for the reasons set out below, the Court DENIED Plaintiff's Motion for Summary Judgment [#41] and GRANTED Plaintiff's Motion for Summary Judgment to Dismiss the Counterclaim [#43].

**II .  FACTUAL BACKGROUND**

On September 28, 2012, Plaintiff, Sygnetics, Inc. ("Sygnetics"), filed the instant action against Defendant, HOPS International, Inc. ("HOPS"), alleging breach of contract (Count I) and unjust enrichment (Count II). Thereafter, HOPS filed a counterclaim alleging

1

fraud in the inducement against Sygnetics. Sygnetics is a corporation, headquartered in Michigan, that provides temporary employees to private industries, as well as federal, state, and local governments. *See* Dkt. No. 14. HOPS is a corporation, headquartered in Florida, which specializes in processing data in such a way that managers can make fact-based tactical or strategic decisions based on the information. *See* Dkt. No. 10.

In June 2011, HOPS found itself in a serious financial state requiring the sale of the company or its technology. Around this time, Sygnetics expressed interest in purchasing or combining the companies. The companies had a history of prior relationships, as Lauren White ("White"), a contractor acting as Sygnetics' CEO, and P.J. Fetner ("Fetner"), the owner and CEO of HOPS, were long-time friends, neighbors, and had previously worked together on three separate occasions. Numerous emails were exchanged between White, Fetner, and Tony Tarkowski ("Tarkowski"), the owner and CEO of Sygnetics, discussing plans to combine the companies.

In October 2011, Tarkowski, White, Fetner, and Mary Forte Goodman ("Goodman"), HOPS sole owner, met to discuss a potential business relationship. Following the October meeting, Tarkowski, White, and Fetner continued to converse, telephonically and in person. In early November 2011, Fetner circulated to White and Tarkowski a summary business plan that provided for HOPS to contribute its proprietary technology and certain management to a new entity (generally referred to as "Newco"), and in which Sygnetics would invest $10 million. The equity split in Newco was intended to be 50% to HOPS, 25% to Sygnetics, and 25% to a passive financial group.

In early December 2011, HOPS told Sygnetics that offers were coming in from other

suitors and that it needed a signal from Sygnetics on whether it was committed to moving forward with the Newco plan. Sygnetics reassured HOPS that the Sygnetics proposal was completely approved, although it depended on securing certain funding, and it anticipated being closed by the end of the month. According to HOPS, Sygnetics agreed to the joint venture, which included Sygnetics' funding to Newco in an amount roughly equivalent to $10 million. HOPS further argues that the parties overarching agreements did not include repayment by HOPS, rather the advances were intended to keep Newco alive and moving forward.[1] Sygnetics would receive full credit only if Newco actually went forward, which it did not. However, Sygnetics eventually expressed an inability to close by the end of December and suggested the parties seek interim "bridge" financing. HOPS agreed to consider the plan and Sygnetics hired investment banking firm Hunter Wise to help secure the required financing. However, Hunter Wise was unable to secure funding by the end of December 2011.

In January 2012, Sygnetics suggested, for the first time, that it might have to borrow or raise equity capital to meet a sizeable portion of its financial commitment. HOPS agreed to consider such funding, so long as Sygnetics immediately furnished certain minimal working capital to assist operations through the first quarter of 2012. At all times prior to January 2012, Sygnetics represented to HOPS that it had the financial resources to provide the promised $10 million necessary to keep the joint venture alive. According to HOPS, Sygnetics wished to borrow all or some of the short-term capital required by invoicing the

---

[1] The funding went to the former managers of HOPS who were now acting as "consultants" to Sygnetics, and to working capital expenses for Newco.

amounts to HOPS and presenting the invoices to Sygnetics' local bank and borrowing against same as allowed under a line of credit with the bank.

On January 1, 2012, Sygnetics and HOPS executed a promissory note which stated that HOPS promised and agreed "to pay to the order of Sygnetics...the principal amount of this Note, together with such interest as may be due and owing." Additionally, the promissory note contained a "Nature of Indebtedness" clause which stated:

> Borrower and Lender are in the process of securing certain bridge financing to begin a formal combination of the companies. Prior to this event, Lender has agreed to fund certain payroll and working capital expenses of HOPS to maintain current operations and such expenses of the transition to the combination incurred by HOPS that appear mandatory.

The promissory note concluded with the requirement that the principal balance and interest be paid in full at maturing (the sooner of the completion of the bridge financing or July 31, 2012), the collapse of the combination effort, or as part of the bridge financing.

On January 13, 2012, Sygnetics and HOPS entered into a Consultant Services Agreement ("the Agreement") which established that HOPS would pay Sygnetics for services provided to HOPS. The Agreement covered any consultants hired by Sygnetics for HOPS between January 1, 2012 and December 31, 2012 and identified that Sygnetics would invoice HOPS for 112% of the funds paid to the hired consultants. In March 2012, HOPS was shown Sygnetics financials prepared by Hunter Wise and realized Sygnetics did not have the funds originally promised. Additionally, Hunter Wise did not support the Newco idea. Ultimately, Sygnetics failed to provide the promised funding and the Newco

4

plan collapsed in mid-2012. HOPS's claim[2] argues that Sygnetics misrepresentation of its financial resources was entirely fraudulent and detrimentally caused HOPS to drop all other prospects or potential partners and enter into a joint venture agreement with HOPS. HOPS asserts that it has suffered approximately $5 million in damages due to Sygnetics' fraud/fraudulent inducement.

Sygnetics bases its claims on the argument that pursuant to the January 1, 2012 promissory note, HOPS borrowed money from Sygnetics to pay debts and to retain consultants in order to keep the joint venture moving forward. Sygnetics paid $147,000 to Goodman, and $91,000 to other individual consultants - Larry Fishel, Evelyn Rodriguez, and Simeon Kohl. HOPS has not repaid any of $266,560[3] "due" and Sygnetics consequently argues breach of contract**.** However, this Court previously held that the January 1, 2012 promissory note "is not the operative agreement between the parties," rather the January 13, 2012 Consultant Agreement controls because it contains a merger closure. *See* Dkt. No. 38 at 6

### III.    LAW & ANALYSIS

####  A.    Standard of Review

Federal Rule of Civil Procedure 56(a) permits a party to:

[M]ove for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought. The court shall grant

---

[2] HOPS argues that Sygnetics, in its motion for summary judgment, provided a highly summarized version of the background that obscures and omits relevant details.

[3] Sygnetics maintains it paid $238,000 to consultants on HOPS behalf and is therefore entitled to $266,560 from HOPS due to the 112% agreement.

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has affirmed the use of summary judgment and recognized it as an integral part of the fair and efficient administration of justice. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party seeking summary judgment "bears the initial burden of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The burden then shifts to the non-moving party to produce "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968). The evidence presented must be such on which a jury could reasonably find for the defendant; mere denials, unsupported allegations, or speculations will not be enough to meet this burden. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. Plaintiff's Motion for Summary Judgment

Sygnetics maintains that a joint venture is an "association to carry out a single business enterprise for profit." *Kay Investment Co., LLC v. Brody Realty No. 1, LLC,* 273 Mich. App. 432, 437 (2006). Additionally, Sygnetics argues that all joint ventures have six elements: (a) an agreement indicating an intention to undertake a joint venture; (b) a joint undertaking of; (c) a single project for profit; (d) a sharing of profits as well as losses; (e)

contribution of skills or property by the parties; (f) community interest and control over the subject matter of the enterprise." *Berger v. Mead*, 127 Mich. App. 209, 214-15 (1983). According to Sygnetics, HOPS did none of the above and there is no evidence to show that Sygnetics made any promises or misrepresentations to HOPS.

However, contrary to Sygnetics assertions, the facts in their entirety, as presented by HOPS and supported by numerous affidavits and emails,[4] establish that Sygnetics and HOPS did enter into a joint venture for the development of Newco in late 2011/early 2012.

Sygnetics maintains that it paid $238,000 to consultants on HOPS's behalf and therefore it is entitled to $266,560 from HOPS. In *Carpenter v. Smith*, 147 Mich. App. 560, 564-65 (1985), the court held that refusal to perform is a breach of contract. Since HOPS has failed or refused to reimburse Sygnetics, Sygnetics argues HOPS is in breach of the contract established between the parties through the promissory note and the Agreement.

Alternatively, HOPS argues that Plaintiff's Motion for Summary Judgment as to the breach of contract claim should not be granted because genuine issues of material fact exist. First, HOPS asserts that the parties never intended that the Agreement would define the concessions made between the parties with respect to the monetary advances provided by Sygnetics. Explicitly and implicitly Sygnetics repeatedly invokes the failure of the joint-venture to proceed as the triggering event of the obligation to repay, a condition nowhere present in the Agreement. HOPS maintains that the Agreement was intended to be used for a specific purpose and that the parties had agreed to a larger context - the

---

[4] HOPS's Response includes numerous emails between White, Fetner, and Tarkowski from November 2011 through March 2012, that extensively discuss the companies relationship in establishing Newco.

understanding to treat all advances as part of continued equity supplementing the bank-borrowing scheme.

Additionally, HOPS asserts that if a supplemental or collateral agreement[5] would ordinarily not have been included in the written document being relied upon, the parol evidence rule is generally relaxed and permits the court to consider the supplement. In *Tepsich v. Howe Construction Co.*, 377 Mich. 18 (Sup. Ct. 1965), plaintiffs, owners of a parcel of realty, entered into a preliminary agreement with defendant Howe Construction Co. ("Howe"), giving the construction company the opportunity to purchase plaintiff's land. *Id.* at 20. Five months later, defendant Capitol Plaza, Inc. ("Capitol") entered into an agreement with plaintiffs, in which Capitol exercised the purchasing option that had been assigned to it by Howe. *Id*. Plaintiffs executed a quitclaim deed to extinguish the option, of record. *Id*. The *Tepsich* court held that parol evidence was admissible to show that the writing was a sham between the parties in that it was not intended to create a legal relationship, even in a situation where the writing may not appear to be a sham to third parties. *Id.* at 23. *Tepisch* is analogous to the instant case, where the negotiations in January over the eventual language of the Agreement, and the initial and later understandings to treat advances as early equity, all appear to present a genuine issue of material fact as to the parties true intent and agreement.

Secondly, HOPS argues that the Agreement was only intended to be used if a particular event occurred, and the specified event never took place. HOPS asserts that the

---

[5] Referring to the bank-borrowing scheme HOPS alleges Sygnetics was engaged in.

parties only intended to use the Agreement if Sygnetics actually did employ it at a bank for the purpose of executing an invoicing scheme. HOPS maintains that the entire invoicing scheme, including making prior HOPS employees "contractors" under Sygnetics, was predicated upon borrowing money under an existing line of credit with Sygnetics' bank. Courts have interpreted the parol evidence rule to permit proof of an oral condition that the written agreement was only to be used if a particular event occurred. *Orr v. Schmidt, Ellis & Associates*, 28 Mich. App. 176, 180 (1971).

Third, HOPS argues that the parties eventually superseded the Agreement, and all prior understandings, by a subsequent oral agreement. The parol evidence rule relates purely to what comes before in time the writing sought to be enforced and consequently never bars evidence that after signing an agreement, the parties orally agreed to modify or rescind it. *Rasch v. Nat'l Steel Corp.*, 22 Mich. App. 257, 260-61 (1970). The intent of the parties is a jury question. *See Weitz Co. v. MH Washington*, 631 F.3d 510, 524 (8th Cir. 2011).

Finally, HOPS argues that Sygnetics fraudulently induced HOPS to enter into a repayment plan. HOPS never before accepted advances from Sygnetics with any promise of repayment, rather, Sygnetics was a viable partner and any advances would likely be worked into the joint venture. Furthermore, at the time HOPS and Sygnetics entered into the agreement, HOPS had no revenue or resources to pay any such indebtedness. Under Michigan law, despite the presence of a merger clause, a party could justifiably rely on, as an element of fraud in the inducement, pre-contractual representations regarding things outside the strict scope of the contractual terms. *Star Ins. Co. v. United Commercial Ins.*

*Agency*, 392 F. Supp. 2d 927, 930 (E.D. Mich. 2005).

As stated on the record during the November 6, 2013 hearing, this Court finds that HOPS has provided sufficient evidence to establish a disputed material fact in regards to the promissory note and ambiguities in the contract. Therefore, Sygnetics is not entitled to summary judgment as to Count I of the Complaint.

### D.     Plaintiff's Motion for Summary Judgment on Counterclaims

To establish fraud, Sygnetics argues that HOPS must prove:

(a) Sygnetics made a representation of a material fact.
(b) The representation was false when it was made.
(c) Sygnetics knew the representation was false when it made it, or Sygnetics made it recklessly, that is, without knowing whether it was true.
(d) Sygnetics made the representation with the intent that HOPS rely on it.
(e) HOPS relied on the representation.
(f) HOPS was damaged as a result of its reliance.

*Disner v. Westinghouse Elec. Corp.*, 726 F2d 1106, 1111-12 (6th Cir. 1984); *Candler v. Heigho,* 208 Mich. 115, 121 (1919); *United States Fidelity Guar. Co. v. Black*, 412 Mich. 99, 114-34 (1981). In a case alleging fraud, "[t]he burden of proof rests with the plaintiffs. Fraud will not be presumed but must be proven by clear, satisfactory and convincing evidence." *Youngs v. Tuttle Hill Corp.*, 373 Mich. 145, 147 (1964).

Sygnetics maintains that a mere broken promise, in its case the failure to follow through with Newco, "does not constitute fraud, nor is it evidence of fraud." *Marrero v. McDonnell Douglas Capital Corp.*, 200 Mich. App. 438, 444 (1993), and that HOPS is impermissibly attempting to construct "fraud" from the emails and documents recording Sygnetics' promise to move forward with the Newco plan. There was never any guarantee made by Sygnetics with regards to the $10 million HOPS claims Sygnetics promised to

invest in Newco. All of the statements made by Sygnetics were future promises and were "thus contractual and cannot be the basis for an action of fraud. *State Bank of Standish v. Curry*, 190 Mich. App. 616, 623 (1991).

In *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330 (1976), the plaintiffs alleged that they were "fraudulently induced into entering a franchise agreement with defendant by the representations of defendant's agents that plaintiff...would be the exclusive heavy-duty truck dealership in the Alpena[, Michigan] area." *Id.* at 333. In its determination, the *Hi-Way* court considered whether or not the defendant's agents had made a material representation to the plaintiffs, and confirmed that "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Id.* at 336. While plaintiffs argued the aforementioned promise created a franchise agreement, the court found no such construction, and further held that they were unable to find any "evidence from which it could reasonably be inferred either that defendant's agents gave their promises without intention of performance or that they misrepresented a past or present fact." *Id.* at 337-39. Sygnetics argues the same analysis is applicable in the instant case where even if the Court considers the evidence in a light most favorable to the non-moving party, there is still no prima facie case to establish that Sygnetics acted with fraudulent intent.

Furthermore, Sygnetics points to this Court's Order [# 38] in denying Sygnetics leave to amend its complaint and its recognition that FED. R. CIV. P. 9(b) requires "that a plaintiff allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendant; and the injury resulting

from the fraud." *Sanderson v. HCA -The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006). Sygnetics claims HOPS fails to properly adhere to FED. R. CIV. P. 9(b) as interpreted by this Court.

HOPS alternatively asserts that like the breach of contract claim, Sygnetics' Motion for Summary Judgment as to the counter-claim should not be granted because there is sufficient evidence of disputed material facts. Contrary to Sygnetics assertions, HOPS argues that a claim of fraud rests on five factors, and in the instant case, evidence supports a finding in HOPS favor.

First, HOPS states that fraud rests on a misrepresentation of a material fact. In the instant case, HOPS maintains that Sygnetics misrepresented to HOPS its ability to pay up to $10 million in the venture and a direct investment of $5 million, when it did not actually have the financial resources or intent to do so.

Second, HOPS argues that Sygnetics had scienter, and if HOPS had known about the misrepresentations of material facts it would be logically impossible for a CEO and COO not to know their company's true financial position.[6] However, HOPS maintains that its proof of knowledge of false or reckless indifference to the truth is limited because of Sygnetics' discovery stonewalling.

Third, HOPS asserts that Sygnetics had the intent to induce reliance. In support, HOPS argues that the fact that a prior relationship existed between some of the higher-ups of the companies increases the reality that Sygnetics knew HOPS would be more

---

[6] Therefore, HOPS maintains that any argument Sygnetics makes that the promises made to HOPS were "uninformed" should be disregarded.

trustworthy and rely on Sygnetics promises.

Fourth, HOPS justifiably relied on Sygnetics promises. HOPS maintains that Sygnetics' argument that there can be no fraud in promising $10 million for a joint venture when the deal was never materialized, does not work if the reason that the deal did not go forward was because of Sygnetics' fraudulent promises and lack of funding available to the promisor. HOPS did not have a duty to investigate or undertake reasonable diligence to verify the misrepresentations by Sygnetics. *Titan Insurance Co. v. Hyten*, 491 Mich. 547, 557 (2012). Consequently, HOPS maintains that its reliance on Sygnetics' promises lead HOPS to suffer significant damages.

While it is undisputed that HOPS and Sygnetics entered into some form of promisory agreement, case law clearly supports Sygnetics in a finding that a broken promise does not constitute fraud, irregardless of the fact that another party may have relied on said promise.

### IV.     CONCLUSION

It Is Ordered that Plaintiff's Motion for Summary Judgment [#41] is DENIED.

Plaintiff's Motion for Summary Judgment to Dismiss Counterclaim [#43] is GRANTED.

SO ORDERED.

/s/ Gershwin A. Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated: November 15, 2013

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
November 15, 2013, by electronic and/or ordinary mail.

/s/ Tanya Bankston
Deputy Clerk